***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties and their representatives. Accordingly, the Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Rowell.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS *Page 2 
1. The date of the incident which is the subject of this claim is February 4, 2004.
2. On such date the parties hereto were subject to and bound by the provisions of the North Carolina Worker's Compensation Act and an Employer-Employee relationship existed between Plaintiff and the self-insured Defendant-Employer.
3. On February 4, 2004, Defendant-Employer employed three (3) or more employees.
4. On February 4, 2004, the third party administrator of worker's compensation claims for Waste Management d/b/a Waste Management of Whiteville in North Carolina was Gallagher Bassett Services, Inc.
5. Plaintiff's average weekly wage is $577.22.
6. The parties participated in a mediated settlement conference on February 20, 2008. Defendants have paid the mediation fee in the amount of $1,190.00. Pursuant to Rule 7(c) of the Rules for Mediated Settlement and Neutral Evaluation Conferences of The North Carolina Industrial Commission, Defendants are entitled to a credit in the amount of $595.00 for payment of Plaintiff's share of the mediation costs, and Defendant may withhold funds from any award for this purpose.
7. The Parties Stipulated into evidence as Stipulated Exhibit # 1, the Pre-Trial Agreement, as modified and initialed by the parties.
8. The Parties Stipulated into evidence as Stipulated Exhibit # 2, Notebook, as referenced by the table of contents to include I.C. Forms and medical records, as modified and initialed by the parties.
 *********** *Page 3 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 FINDINGS OF FACT
1. Plaintiff is 28 years old and worked as a truck driver for Defendant-Employer when he was involved in a rear end collision on February 4, 2004. He was driving a large garbage truck on the date of the incident when he was rear ended by another vehicle.
2. The claim was accepted as compensable pursuant to a Form 60 immediately following the incident, and Plaintiff has received substantial medical treatment and indemnity compensation as a result of the February 4, 2004 incident. Plaintiff's average weekly wage at the time of the February 4, 2004 incident was $577.22, yielding a weekly compensation rate of $384.83
3. Plaintiff received extensive medical care following his February 4, 2004 accident, including treatment with various providers at Whiteville Urgent Care, Dr. Charles Haworth, Dr. Alan Friedman, a neurosurgeon at Duke University, Dr. Craig Donatucci, a urologist at Duke University, and Dr. Toni Harris, an anesthesiologist at Eastern Carolina Pain Management.
4. In addition to these authorized providers, Plaintiff also received extensive medical treatment between 2004 and 2008 with other physicians, without knowledge by his authorized treating physicians or by Defendant. A complete copy of Plaintiff's medical records were introduced into evidence at hearing and marked as Stipulated Exhibit 2.
5. In addition to medical treatment, Plaintiff received temporary total disability benefits following the February 4, 2004 motor vehicle accident until November 14, 2006, when Defendant learned that Plaintiff was working as an EMT. During this time period, Plaintiff received weekly temporary total disability checks totaling $55,800.35. *Page 4 
6. Defendant, a self-insured employer, provided medical treatment to Plaintiff totaling nearly $200,000.00 from 2004 until 2008.
7. After Defendant learned that Plaintiff was working, a Form 28T, Notice of Termination of Compensation by Reason of Trial Return to Work, was filed on November 20, 2006 and indemnity compensation was terminated effective November 14, 2006. The Form 28T indicated that upon receipt of Plaintiff's current earnings that Defendants would pay the appropriate amount of temporary partial disability. On March 22, 2007, John Ward with Nakina Fire and Rescue faxed to defendants the amount of pay per week Plaintiff received from March 23, 2006 through January 24, 2007. Defendants did not pay to Plaintiff temporary partial disability.
8. Defendant filed a Form 33 hearing request on April 3, 2007 seeking reimbursement for overpayment of indemnity compensation while Plaintiff was employed as an EMT while receiving temporary total disability compensation and purporting to be disabled. All Industrial Commission forms were introduced into evidence in the hearing notebook marked as Stipulated Exhibit 2.
9. Plaintiff became a member of the Nakina Fire and Rescue Squad on March 17, 2004. Plaintiff worked as a "volunteer EMT" until January 1, 2008, when Plaintiff was suspended from the Department for reasons unrelated to this claim.
10. Throughout this time period from 2004 to 2008, and as evidenced in the medical records and doctors' depositions, Plaintiff presented to his medical appointments with his authorized providers ambulating with a wheelchair, rolling walker, or cane.
11. Plaintiff did not tell his neurosurgeon, Dr. Alan Friedman, that he had been working as an EMT because he wanted to continue with his workers' compensation claim *Page 5 
against Defendant.
12. Jimmy Williams, former Chief of Nakina Fire and Rescue, testified that rescue squad volunteers were paid $25.00 per call, and may make four or five calls per day.
13. Chief Williams personally worked alongside Plaintiff as an EMT from the middle of 2004 until he was suspended in January of 2008 for reasons unrelated to Plaintiff's alleged disability.
14. Chief Williams personally witnessed Plaintiff drive the truck, perform patient care in the back of the truck, including checking vital signs, blood pressure and pulse, giving oxygen, dressing wounds, performing spinal immobilization and other usual duties of an EMT worker from 2004 until 2008.
15. John Ward, Plaintiff's uncle and Chairman of the Board of Nakina Fire and Rescue testified at hearing that Plaintiff joined the squad in 2004, after obtaining the certifications necessary to work as an EMT.
16. Mr. Ward personally ran calls as an EMT with Plaintiff. Plaintiff did not perform the job in a wheelchair, with a cane, or with a rolling walker. In addition, State regulations require an EMT to be able to pick up at least 50 pounds.
17. According to Mr. Ward, many business records were kept at the Nakina Fire and Rescue headquarters, but he was unable to produce the records because the building burned down in November of 2007.
18. Debra Ward, Plaintiff's aunt and full-time Nakina Fire and Rescue employee, also worked as an EMT alongside Plaintiff. According to Mrs. Ward Plaintiff began making runs as an EMT following his certification sometime in 2004, and continued until his suspension in January of 2008. *Page 6 
19. Mrs. Ward went on emergency runs with Plaintiff, and Plaintiff was on the schedule every week. She observed him performing the duties of an EMT without the use of a wheelchair or rolling walker, including pulling hoses from a truck. According to Mrs. Ward, Plaintiff "pulled his weight" as a member of the rescue squad.
20. In addition to working as an EMT, Plaintiff also occasionally filled in for hourly employees doing office work, for which he was paid $9.00 per hour.
21. In January of 2007, Plaintiff advised Mrs. Ward that he could no longer receive payment for his work as an EMT because workers' compensation was seeking re-payment of money that he received. However, he continued to work as a member of the Department until his suspension from the squad in January of 2008.
22. James "Randy" Reaves, Plaintiff's cousin and neighbor, witnessed Plaintiff in late 2007, use a front end loader and ladder to climb a tree in order to place a Christmas star at the top of the tree. He also observed Plaintiff mowing the lawn, building a deck and assisting in carrying his wife on a stretcher out of his house.
23. Patricia McKeithan worked with Plaintiff at Nakina Fire and Rescue as a salaried, daytime employee and EMT. She also worked alongside Plaintiff as an EMT beginning in 2004 or 2005 until he was suspended in 2008.
24. While working with Mrs. McKeithan, Plaintiff performed the regular job duties required of a rescue squad employee. She never observed Plaintiff working as an EMT using a wheelchair or rolling walker. Plaintiff never told Mrs. McKeithan that he was disabled.
25. Mrs. McKeithan shared duties equally with Plaintiff while working on rescue calls, and Plaintiff performed all of the duties of a rescue squad employee.
26. On March 26, 2007, Plaintiff presented to Whiteville Urgent Care where he *Page 7 
underwent a CDL (commercial drivers' license) physical. He reported that he had undergone spinal surgery for a benign tumor and took medication on an as-needed basis only. He reported that he had no impairments or physical limitations. Denise Cavileer performed the physical evaluation as required by the Department of Labor and advised that Plaintiff was cleared for a two year CDL.
27. On March 27, 2007, Plaintiff underwent a functional capacity evlautaion (FCE) performed by Ms. Linda Sain. Ms. Sain noted Plaintiff's physical capability was less than or equal to sedentary, with an occasional exertion of up to ten pounds of force and/or negligible amount of force frequently and sitting or standing for less than ten minutes occasionally. Ms. Sain further noted Plaintiff projected to be unable to climb stairs or ladders and to have difficulty with any tasks that required unilateral or bilateral carrying as he ambulated with a rolling walker.
28. On January 27, 2009, the parties deposed Dr. Alan Friedman neurosurgeon-in-chief at Duke University Medical Center. Dr. Friedman, testified at length regarding his treatment of Plaintiff, beginning in October of 2004. He diagnosed Plaintiff with a congenital tethered spinal cord and neurenteric cyst, which were aggravated by the February 4, 2004 accident.
29. Dr. Friedman ultimately performed surgery to correct the condition on February 9, 2005 without complication. Following surgery, Plaintiff regularly followed up with Dr. Friedman. During these visits, Plaintiff ambulated with a walker and could barely move around his office.
30. Plaintiff never told Dr. Friedman that he passed a DOT physical clearing him for a two year CDL on March 26, 2007. After reviewing the DOT report and notations that Plaintiff had no physical impairments or limitations Dr. Friedman testified, "well, it wasn't the guy I saw, *Page 8 
that's for sure."
31. Plaintiff also never told Dr. Friedman that he was working as an EMT while under his treatment and care between October of 2004 and April of 2007. Dr. Friedman testified that, if this information was credible, then there was no reason for him to be treating Plaintiff for pain.
32. Dr. Friedman testified that "here's a guy who literally creeps around my office and can barely move, essentially, and I'm taking that for face value. Now, if he's out there and lifting a patient on a stretcher, if he's moving around and, you know, if he's pulling off the fire hose and so forth, that's completely inconsistent with anything I saw."
33. According to Dr. James Pridgen, an internist with Whiteville Urgent Care, during the DOT (Department of Transportation) physical at Whiteville Urgent Care no physical impairments or limitations were noted. There was no mention of Plaintiff being unable to work, unable to care for his son due to back problems, being entirely dependent on a rolling walker or wheelchair, having an altered mental status or difficulty talking, or only being able to drive short distances. If Plaintiff had reported any of these things, he would not have been cleared for a two year commercial drivers' license.
34. Dr. Toni Harris, who is board certified in anesthesia and pain medicine, treated Plaintiff from 2005 until early 2008. Plaintiff never told Dr. Harris he was working as an EMT. Plaintiff presented to Dr. Harris that he was not capable of doing anything, his child had to be placed in his arms because he could not lift him, and that he was incapable of carrying on personal activities.
35. Dr. Harris opined that if Plaintiff was performing the activities of an EMT in 2005, 2006, and 2007, that Plaintiff had no limitations whatsoever. Dr. Harris agreed with Dr. Friedman's *Page 9 
testimony that, if the Industrial Commission found these facts to be true, then there was no reason to continue treating Plaintiff and agreed with Dr. Friedman's testimony that these activities could cause a bulging disc to herniate.
36. Dr. Harris last treated Plaintiff on February 12, 2008, and she determined that "there was no point in seeing him. He was so dishonest there was nothing more to do. I didn't know what he was taking. I couldn't trust anything he said."
37. On February 12, 2008, Plaintiff reported to Dr. Harris that he was doing much better and his gait was normal. Dr. Harris indicated that she had learned Plaintiff was being prescribed Ambien, Zoloft, and Klonopin by another doctor, but had failed to report these medications. She noted that these particular medications cause urinary retention, and that she did not believe Dr. Donatucci was aware that he was being prescribed these drugs. Dr. Harris indicated that it was hard for her to believe that he had been self-catheterizing without evaluation of these medications, and questioned whether his urinary symptoms were as severe as he reported. She noted that Plaintiff was dishonest when he told her that his wife brought him to an appointment when he was actually observed driving himself. Additionally, Dr. Harris noted that Plaintiff passed his CDL license at Whiteville Urgent Care on March 26, 2007 which "spoke to his level of improvement and lack of disability." Dr. Harris released Plaintiff at maximum medical improvement (MMI) and assigned a 2% permanent partial impairment rating to his back.
38. Plaintiff testified at the hearing before the Deputy Commissioner that he told Dr. Harris that he was also treating consecutively with Dr. Perdue. However, Dr. Harris' medical records contain no mention of this, and Dr. Harris was adamant that she was unaware Plaintiff was also treating and receiving controlled substances from Dr. Perdue in violation of her controlled substances agreement. *Page 10 
39. Plaintiff also testified that he informed Dr. Perdue (an unauthorized provider) that he was treating with and receiving prescriptions from Dr. Harris. Dr. Perdue's February 4, 2008, medical record indicated that she had no knowledge of this treatment, and that Plaintiff was in violation of her controlled substances agreement.
40. Dr. Harris and Dr. Friedman both opined that Plaintiff's activities as an EMT could cause his bulging disc to herniate. The stipulated medical records reflect that Plaintiff was diagnosed with a new, small disc herniation at L4-5 following an MRI on November 13, 2007. Prior diagnostic testing revealed a bulge at L4-5 rather than a herniation.
41. Dr. Harris opined that he did not see a relationship between the February 2004 car accident and a herniated disc.
42. In Dr. Friedman's opinion, if Plaintiff was working as an EMT while purporting to be totally disabled, then he believed that Plaintiff was capable of returning to work. Dr. Harris agreed that if Plaintiff worked as an EMT in 2005, 2006, and 2007, then Plaintiff was capable of returning to work.
43. The Full Commission finds based upon the greater weight of the credible evidence that Plaintiff's testimony is not credible and is afforded little weight.
44. Although, Dr. Friedman released Plaintiff to return to work with sedentary restrictions on June 21, 2005, this release was based upon plaintiff's subjective complaints of pain. Further, Plaintiff was engaged in work activities as an EMT which exceeded the level of sedentary employment. The greater weight of the evidence shows that plaintiff misrepresented his physical condition and that Plaintiff failed to prove that he was unable to work in any employment after June 21, 2005.
45. The greater weight of the evidence shows that Plaintiff was entitled to temporary *Page 11 
partial disability from June 22, 2005 through January 1, 2008 when, Plaintiff was employed at Nakina Fire and Rescue, for the periods in which his earnings were less than his preinjury wages.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident while employed with Defendant on February 4, 2004. N.C. Gen. Stat. § 97-2(6).
2. To prove disability, an injured worker must prove that he is unable to earn the wages which he was earning at the time of the injury in the same or any other employment. N.C. Gen. Stat. § 97-2(9). Plaintiff has failed to prove that he was totally disabled after June 21, 2005. Defendants are entitled to a credit for over payment of temporary total disability paid after June 21, 2005.
3. As the result of his compensable injury by accident in February 2004, Plaintiff was temporarily partially disabled and entitled to payment by Defendants of temporary partial disability compensation at the rate of two-thirds of the difference between the average weekly wages Plaintiff earned prior to the injury by accident and the diminished wages he was able to earn beginning June 22, 2005 through January 1, 2008. N.C. Gen. Stat. § 97-30.
4. Plaintiff has failed to prove that any loss of wage earning capacity that he may have suffered after his termination, unrelated to this claim, on January 1, 2008 is a result of his compensable injury. Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E. 2d 397 (1996).
5. Plaintiff has failed to prove that he is entitled to further medical compensation *Page 12 
after June 21, 2005. N.C. Gen. Stat. § 97-25.
6. Plaintiff is entitled to a 10% late payment penalty for past due disability compensation. N.C. Gen. Stat. § 97-18(g).
 ***********
Based on the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission makes the following award:
 AWARD
1. Defendant shall pay to Plaintiff temporary partial disability benefits from June 22, 2005 through January 1, 2008. This amount is subject to a credit for over payment of temporary total disability payments made after June 21, 2005.
2. Plaintiff shall repay or reimburse Defendant for any over payment of temporary total disability payments which exceeds the amounts due Plaintiff .
3. Defendant shall pay to Plaintiff a 10% late payment penalty for all unpaid compensation due Plaintiff.
4. This matter is referred to the Fraud Investigation Unit of the North Carolina Industrial Commission for an investigation and determination as to whether remedies are available pursuant to N.C. Gen. Stat. § 97-88.2.
5. Each side shall bear its own costs.
This the 8th day of June 2010.
 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1